ODOM, J.
 

 Plaintiff and defendant were married on May 4, 1917, and, with the exception of two separations of short duration, lived together in the bonds of matrimony until a short time prior to the institution of this suit. One child, a boy about eight years old at the time the suit was filed, was born to the union.
 

 
 *161
 
 On September 14, 1929, Mrs. Andras filed suit against ber husband for separation from bed and board, asking for custody of the minor child and for alimony. As grounds for the separation, she alleged that her husband had been guilty of such excesses, cruel treatment, and outrages toward her as to render their living together insupportable. Oiv. Code, art. 138. Going into detail, she alleged at great length that her husband had neglected her by failing to provide the means to purchase many of the necessities of life, notwithstanding his salary of $175 per month was ample for such purpose; that he refused to provide her an allowance with which to pay her personal expenses and was so stingy and penurious that she was forced to purchase household necessities, such as ice and groceries, on credit and then abused her for making debts; that he refused to permit her to attend shows and other places of amusement, refused to permit her to visit her mother and sisters, and refused to permit her to use his automobile; that he abused and humiliated her in the presence of her relatives and friends; that he habitually cursed and abused her and used vile, vulgar, and indecent language in the presence of their child; that on one occasion he struck her, took hold of her and threatened to “jerk her head off,” drew a gun on her and threatened to kill her; that since the death of her father, who lost his life while engaged in the World War, her husband had tried to estrange her from her mother and other relatives.
 

 For answer defendant denied categorically and specifically all these allegations and avowed that he had been a faithful and true husband. He prayed that plaintiff’s demands be rejected and reconvened, asking for an absolute divorce on the grounds of adultery. Paragraph 35 of the answer and reconventional demand reads as follows:
 

 “And now, assuming the position of a plaintiff in reconvention, respondent shows that he has been a good husband to his wife, and has faithfully tried to live up to his marital obligations, but that his said wife, plaintiff herein, has violated her marital obligations and the trust of respondent in this, that she has committed adultery, particularly with the aforesaid Earl Roberts, in the aforesaid apartment house rented and operated by plaintiff in New Orleans, said adulterous act being in the latter part of November, 1925.”
 

 He further alleged that it was only after the filing of this suit by plaintiff that he learned of her infidelity. The trial court rejected plaintiff’s demands, but rendered judgment in favor of defendant on his reconventional demand granting him an absolute divorce.
 

 Plaintiff appealed.
 

 There is involved in this controversy only questions of fact. We find in the record the written opinion of the trial judge from which we quote as follows:
 

 “It appears from the testimony that both plaintiff and defendant bore a good reputation in the City of Bogalusa where they made their home and several disinterested witnesses have testified that the defendant a quiet unassuming man always treated his wife with consideration and respect, and provided for her amply according to his means. It is shown that he made frequent visits with her to New Orleans to see her family and carried her to places of amusement and did those things that a husband should do. The series of outrages and cruel treatment which are alleged in the petition are not borne out by the testimony with that degree of certainty which would justify a court in granting the prayer of her petition.”
 

 
 *163
 
 Our reading of the record convinces us that it amply supports his conclusions with reference to plaintiff’s demands.
 

 But we cannot concur in his opinion in so far as he holds that “the ground for absolute divorce by the husband is proven.”
 

 It is true, as the judge says, that two witnesses testified that Mrs. Andras had committed adultery in 1925. But their testimony, viewed in the light of all the facts and circumstances shown by the record, fails to produce upon our minds that conviction which we must always have before setting our stamp of approval upon a charge that a wife and mother is an adulteress.
 

 This couple had their domicile at Bogalusa, where the husband was employed in the accounting department of the Great Southern Lumber Company, at a salary of $150 per month, later raised to- $175. While this salary was sufficient to maintain them, yet they were not getting ahead, and for that reason the wife proposed to her husband that she take over and operate an apartment of rooming house in the city of New Orleans, which was then conducted by her mother, but who was to give.it up in order to engage in other work. To this proposal the husband assented, and in the early part of 1925 she came to New Orleans, took charge and kept the house during that year. During the year, the husband constantly visited his wife at week-ends, still holding his position at Bogalusa. But as. the venture was a financial failure, the wife gave up the house at the end of the year, went back to Bogalusa, where she and her husband lived together until- September-1929,
 

 The testimony shows that Mr. and Mrs. Andras did not get along well together; they had their “ups-and downs”- almost from the time they were married; but with all that,there is nothing to indicate that Mr. Andras ever suspected that his wife was in fact or was inclined to be unfaithful to him, nor were there whisperings anywhere of misconduct on her part. On the contrary, she bore a good reputation, engaged in civic activities, and was very useful in the community.
 

 In June, 1929, Mrs. Andras visited her mother in New Orleans, using the family car to make the trip. Mr. Andras intended to come to the city on Saturday night to visit her and his child, as he usually did, but instead he came on Friday night in the car of a friend, and while driving by a theater building, he saw his own car parked at the curb, and assuming that his wife was inside attending the show, he returned to the theater building, where his car was still parked, and waited for his wife to come out, but she failed, to appear. He finally left, and while walking down the street, he met his wife in com-, pany with a man named Earl Roberts. Mr. Andras immediately became suspicious, but his wife explained that she and some of her girl friends had been to a party and that on leaving she had met Roberts by accident, and had been with him for only a few moments..
 

 Mr. and Mrs. Andras then went together to the home of Mr. Andras’ sister, where they spent the night. On the following day, Mr..Andras told his sister, Mrs. Reesha, of the' incident of the night before and asked her if she knew of any intimate relationship between his wife and the man Roberts. Mrs.Iieesha informed him that Roberts had frequently visited the rooming house kept by Mrs. Andras in 1925, and that Mrs. Andras had gone out with him. Mr. Andras was asked, “Did you ask your sister any more-than just that?”
 

 He said: “I didn’t ask her any more. Sbesaid she.seen him around the house there and-
 
 *165
 
 that my wife was going out with him, he would have supper with her and like that.”
 

 This conversation took place in June, 1929, and Mrs. Reesha was relating what happened while Mrs. Andras was in charge of the rooming house in 1925, four years before. Mr. Andras asked his wife if it were true that she had ever gone out with Roberts and that he had visited her at the rooming house, and he says she told him it was “all a lie,” and he believed her. On the following day he took his wife and child back to Bogalusa.
 

 Mrs. Andras left her husband in September following and filed this suit. It was then, and not until then, that Mr. Andras says his sister, Mrs. Reesha, and another sister, told him that back in 1925 his wife had, to their knowledge, committed adultery with the man Roberts. Defendant rests his case upon the testimony' of his two sisters.
 

 The record discloses that during the time Mrs. Andras had charge of the rooming house in 1925, her mother lived in the house a portion of the time and that defendant’s mother and two sisters lived there also, probably during the entire time. It is shown that Roberts was a friend of Mrs. Andras’ mother and her family; that he had, as a young man, made social visits to a younger sister of Mrs. Andras and had also visited one of her cousins, but not during the time Mrs. Andras had charge of the house. Mrs. Andras, her mother, and a man who roomed there, all testified that Roberts did not visit the house during that time. But Mrs. Reesha testified that he visited the house constantly, stayed all night, and intimated that he and Mrs. Andras occupied the same room and bed. She says that on one occasion she opened Mrs. Andras’ door (she found it unlocked), looked in, and saw the two lying in bed together.
 

 Mrs. Reesha’s sister says she looked into the room on one occasion and saw the two in their “kimonos.”
 

 These stories seem thin to us for more reasons than one. In the first place, it is unbelievable that Mrs. Andras, who had led a decent life, would have been so bold as to live in adultery in the house where her own mother and child and where her husband’s mother and two sisters lived. According to defendant’s sisters, who were his only witnesses, Mrs. Andras’ adulterous connection with Roberts was almost open; they having testified that Roberts went to the house in his car, parked it in the driveway, stayed all night, and left the next morning; that the pair did not even take the precaution of locking their door.
 

 Mrs. Andras had not at that time severed her relations with her husband. On the contrary, he was visiting her regularly. Most assuredly she did not want him to know that she was living in adultery with Roberts, and yet, according to these witnesses, she was doing so to the knowledge of the very people who would be expected to tell him.
 

 Again, it is not probable that a mother and two sisters would permit their son and brother to be imposed upon by a wife of that character, and yet we are asked to believe that they did so and that they withheld the information from him for four years.
 

 It is suggested that they did not tell him because they did not want his home broken up. We can not accept that pretext.
 

 In addition to this, the man Roberts passed from the scene for four years. Presumably he was living in New Orleans all the while. There is no testimony to the contrary. During this interval Mrs. Andras was constantly visiting in New Orleans, but there is no in
 
 *167
 
 timation that Roberts ever saw her from 1925 until 1929.
 

 Another thing which casts suspicion upon the testimony of Mrs. Reesha is that when her brother asked her in June, 1929, if she knew of any misconduct on the part of-his wife, she did not then tell him of these acts of adultery about which she testified, but only told him that Roberts had visited the house and that she had gone out with him. It was only after Mrs. Ándras filed this suit that Mrs. Reesha and her sister conveyed to him the stale and belated information that, back in 1925, his wife had committed adultery. The testimony is not convincing.
 

 It is therefore ordered and decreed that the judgment appealed from be affirmed in so far as it rejects plaintiff’s demands and orders her suit dismissed; and further ordered and decreed that the judgment in favor of defendant on his reconventional demand granting him an absolute divorce against his wife be reversed and set aside, costs to be paid by the appellant.